**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE CO., GEICO
INDEMNITY CO., GEICO GENERAL INSURANCE
COMPANY and GEICO CASUALTY CO.,

      Plaintiffs,                                      **Jury Trial Demand**

vs.

MARK ALLEN SILVERMAN, D.C., GREGORY MAZZOTTA,
D.C., and SILVERMAN CHIROPRACTIC & REHABILITATION
CENTER, INC.,

      Defendants.

_____/

## COMPLAINT

      Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue the

Defendants and allege as follows:

      1.     This action seeks to recover more than $8,000,000.00 that the Defendants

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through

Defendant Silverman Chiropractic & Rehabilitation Center, Inc. ("Silverman Chiropractic")

relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care

services, including initial examinations, follow-up examinations, chiropractic services, physical

therapy services, nerve conduction studies, pain management injections, and home medical

equipment ("HME") (collectively, the "Fraudulent Services"), that purportedly were provided to

Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent and unlawful PIP claims that the Defendants have submitted or caused to be submitted through Silverman Chiropractic, because:

(i)      the Defendants operated in pervasive violation of: (a) the licensing and operating requirements set forth in the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"); (b) Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims statute"); and (c) the Physical Therapy Practice Act, Fla. Stat. § 486.011-486.172 ("the Physical Therapy Act")  thereby rendering them ineligible to collect PIP insurance benefits in the first instance, and rendering their PIP insurance charges noncompensable and unenforceable;

(ii)     the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services never were legitimately provided in the first instance;

(iv)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently and unlawfully inflate the charges submitted to GEICO; and

(v)      in many cases, Silverman Chiropractic unlawfully billed GEICO for "physical therapy" services performed by a massage therapist or another unlicensed individual.

3.      The Defendants fall into the following categories:

(i)      Silverman Chiropractic is a Florida health care practice that falsely purported to be exempt from the Clinic Act's clinic licensing and medical director requirements, operated in pervasive violation of the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act, and was used by the Defendants as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers.

(ii)     Defendant Mark Allen Silverman, D.C. ("Silverman") is licensed as a chiropractor in Florida. Silverman owned and controlled Silverman Chiropractic, used Silverman Chiropractic as a vehicle to submit fraudulent billing for the Fraudulent

Services to GEICO and other insurers, and purported to perform many of the Fraudulent Services on behalf of Silverman Chiropractic.

(iii)    Defendant Gregory Mazzotta, D.C. ("Mazzotta") is licensed as a chiropractor in Florida. Mazzotta is employed by and/or affiliated with Silverman Chiropractic, used Silverman Chiropractic as a vehicle to submit fraudulent billing for the Fraudulent Services to GEICO and other insurers, and purported to perform many of the Fraudulent Services on behalf of Silverman Chiropractic.

4.    As set forth below, Defendants at all relevant times have known that:

(i)    Silverman Chiropractic operated in pervasive violation of: (a) the licensing and operating requirements set forth in the Clinic Act; (b) the False and Fraudulent Insurance Claims statute; and (c) the Physical Therapy Act, thereby rendering them ineligible to collect PIP insurance benefits in the first instance, and rendering their PIP insurance charges noncompensable and unenforceable;

(ii)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services never were provided in the first instance;

(iv)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently and unlawfully inflate the charges submitted to GEICO; and

(v)    in many cases, Silverman Chiropractic unlawfully billed GEICO for "physical therapy" services performed by a massage therapist or another unlicensed individual.

5.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through Silverman Chiropractic.

6.    The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that Defendants have submitted, or caused to be submitted, through Silverman Chiropractic to GEICO via the mail.

7.     The Defendants' fraudulent scheme began no later than 2016 and has continued uninterrupted since that time. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $9,000,000.00.

**THE PARTIES**

**I.     Plaintiffs**

8.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

**II.     Defendants**

9.     Defendant Silverman resides in and is a citizen of Florida. Silverman was licensed to practice chiropractic in Florida on September 27, 1975. Silverman owned and controlled Silverman Chiropractic, purported to perform or provide many of the Fraudulent Services on behalf of Silverman Chiropractic, and caused the billing for the Fraudulent Services to be submitted by mail through Silverman Chiropractic to GEICO and other insurers.

10.     Silverman has a history of professional discipline by the Florida Department of Health (the "Department of Health"). In particular, in 2016, Silverman was fined and ordered to complete continuing education courses based upon his failure to accurately keep patient records in connection with his treatment of patients at Silverman Chiropractic who had been involved in motor vehicle accidents.

11.     Upon information and belief, Silverman's history of professional discipline – which can be located by prospective employers, referral sources, and patients through a simple internet search – has made it practically impossible for him to obtain legitimate employment as a

chiropractor, and contributed to his decision and motive to participate in the fraudulent scheme described herein.

12.     Defendant Silverman Chiropractic is a Florida corporation with its principal place of business in Miami, Florida. Silverman Chiropractic was incorporated on or about 2002, had Silverman as its president and owner, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

13.     Defendant Mazzotta resides in and is a citizen of Florida. Mazzotta was licensed to practice chiropractic in Florida on January 2, 2004. Mazzotta purported to perform or provide many of the Fraudulent Services on behalf of Silverman Chiropractic and, together with Silverman, caused the billing for the Fraudulent Services to be submitted by mail through Silverman Chiropractic to GEICO and other insurers.

**III.     The Treating Chiropractors and Physicians**

14.     Although not presently named as Defendants in this action, Kevin Palmer, D.C. ("Palmer"), Neil Bressler, D.C. ("Bressler"), Glenn Quintana, D.C. ("Quintana"), Fred Quintanilla, D.C. ("Quintanilla"), and Wilfred Wright Jr., D.C. ("Wright") (collectively the "Treating Chiropractors") are relevant to understanding the claims and allegations in this Complaint. The Treating Chiropractors are all chiropractors licensed to practice chiropractic in Florida, and purported to perform many of the Fraudulent Services on behalf of Silverman Chiropractic.

15.     Yukhanan Benjamin, M.D. ("Benjamin"), Jeffrey Oppenheimer, M.D. ("Oppenheimer"), Farhan Siddiqi, M.D. ("Siddiqi"), Louis Starace, M.D. ("Starace"), Alan Carr, D.O. ("Carr"), and George Ibraheim, D.O. ("Ibraheim") (collectively the "Treating Physicians") also are relevant to understanding the claims and allegations in this Complaint. The Treating

Physicians are physicians licensed to practice medicine in Florida, were employed by or associated with Silverman Chiropractic, and purported to perform many of the Fraudulent Services on behalf of Silverman Chiropractic.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

17.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

18.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

### A.     The Florida No-Fault Law

20.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the Florida Motor Vehicle No-Fault Law (the "No-Fault Law", Fla. Stat. §§ 627.730-627.7405), which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

21.     Under the No Fault Law, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. See Fla. Stat. § 627.736. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form"). See id.

**B.     No-Fault Reimbursement and Compliance with Florida Law Governing Health Care Practice**

22.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

23.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

24.     Thus, health care services providers may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment – including, among other things, the Clinic Act, the Physical Therapy Act, and the False and Fraudulent Insurance Claims statute.

25.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

26.     Under the False and Fraudulent Insurance Claims statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from PIP patients. See Fla. Stat. § 817.234(7).

27.     Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

**C.      No-Fault Reimbursement and the Clinic Act**

28.     Subject to certain limited exceptions, a license issued by the Florida Agency for Health Care Administration is required in order to operate a "clinic" in Florida. See Fla. Stat. § 400.991(1)(a). The Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." See Fla. Stat. § 400.9905.

29.     However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license … .

Fla. Stat. § 400.9905(4)(g)(emphasis added).

30.     Therefore, in order to qualify for this "wholly owned" exemption under the Clinic Act, the licensed health care practitioner who "wholly owns" the practice has a continuing obligation to supervise the business activities of the clinic and remain legally responsible for the clinic's compliance with all federal and state laws, and the practice cannot provide health care services that are beyond the scope of the practitioner-owner's license.

31.     A clinic that does not qualify for the wholly owned exemption, and does not otherwise have a license, operates unlawfully under Florida law.

32.     Unless they are operating pursuant to an exemption from the clinic licensing requirements, clinics operating in Florida not only must obtain a clinic license, but must "appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities on behalf of the clinic." See Fla. Stat. § 400.9935(1).

33.     Among other things, a clinic medical director must be a licensed physician, and must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action." See Fla. Stat. § 400.9935(1).

34.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license", and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

35.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014." See Fla. Stat. § 400.9935(3).

36.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not

entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

37.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements, whether or not the underlying health care services were medically necessary or actually provided.

**D.     No-Fault Reimbursement, Massage Therapy, Massage Therapists, and Physical Therapy**

38.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

39.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services performed by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5)("Medical benefits [that are reimbursable under the No-Fault Law] do not include massage …, regardless of the person, entity, or licensee providing massage …, and a licensed massage therapist … may not be reimbursed for medical benefits under this section.")

40.     The No-Fault Law was amended to prohibit PIP reimbursement for massage or for services performed by massage therapists in response to widespread PIP fraud involving massage services and massage therapists. See, e.g., Florida House of Representatives Staff Analysis for House Bill 119 (amending the No-Fault Law), noting that "PIP fraud remains rampant", and citing dramatic increases in PIP claims for massage therapy as a significant part of the problem.

41.     Pursuant to the Physical Therapy Act, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

42.     The Physical Therapy Act (the "Physical Therapy Act") also prohibits unlicensed individuals from practicing physical therapy. While the Physical Therapy Act does provide an exception to this rule that permits a physical therapist to delegate certain patient care activities an unlicensed assistant, that exception only applies if the unlicensed assistant works under the direct supervision of a physical therapist. See Fla. Stat. § 486.161(3).

43.     Health care practices in Florida may not collect PIP Benefits for any services performed by massage therapists, or for physical therapy services that are performed by unlicensed individuals without direct supervision by a licensed physical therapist.

**E.      No-Fault Reimbursement and Medical Necessity**

44.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. See Fla. Stat. § 627.736. At the same time, a health care services provider, including a clinic licensed under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services. Id.

45.     Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

> (a) In accordance with generally accepted standards of medical practice;
>
> (b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and
>
> (c) Not primarily for the convenience of the patient, physician, or other health care provider.

See Fla. Stat. § 627.732.

**F.      No-Fault Billing and No-Fault Reimbursement**

46.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP

Benefits:

(i)      for any service or treatment that was not lawful at the time rendered;

(ii)     to any person who knowingly submits a false or misleading statement relating to the claim or charges;

(iii)    for any treatment or service that is upcoded; or

(iv)    with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

See Fla. Stat. § 627.736.

47.     The No-Fault Law's billing requirements provide – among other things – that all

PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers

for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well as the

guidelines promulgated by the American Medical Association ("AMA") in connection with the

use of current procedural terminology ("CPT") codes. See Fla. Stat. § 627.736.

48.     By listing a health care practitioner in Box 31 of a HCFA-1500 form, the billing

provider represents that the practitioner performed or directly supervised the underlying services,

and "[t]o directly supervise, a doctor must be physically present at the facility". See Medicare

Claims Processing Manual, Chapter 26, Item 31.

49.     Additionally, in order for a health care service to be eligible for PIP reimbursement,

the applicable claim form must set forth the professional license number of the provider who

personally performed or directly supervised the underlying health care service, in the line or space

provided for "Signature of Physician or Supplier, Including Degrees or Credentials." See Fla. Stat. § 627.736.

## II.     The Defendants' Fraudulent Scheme

50.     Since at least 2016, and continuing through the present day, the Defendants masterminded and implemented a massive fraudulent scheme in which they billed GEICO and other Florida automobile insurers millions of dollars for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services. –

### A.     Violations of the Clinic Act

51.     As part of the Defendants' fraudulent and unlawful scheme, Silverman operated Silverman Chiropractic in pervasive violation of the Clinic Act.

52.     Silverman Chiropractic was a "clinic" within the meaning of the Clinic Act, in that it is an entity "where health care services are provided to individuals and which tender[ed] charges for reimbursement for such services".

53.     However, Silverman Chiropractic never had a clinic license or medical director.

54.     Instead, Silverman Chiropractic was – at all times – owned by Silverman, and purported to operate under the "wholly owned" exemption to the Clinic Act's licensing, operating, and medical director requirements.

55.     However, Silverman never legitimately supervised the business activities of Silverman Chiropractic, inasmuch as Silverman never conducted legitimate reviews of the billing or treatment records from Silverman Chiropractic to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to remedy the fraudulent and unlawful charges submitted through Silverman Chiropractic, as described herein.

56.     To the contrary, Silverman participated in and directed the fraudulent and unlawful scheme described herein.

57.     Moreover, Silverman could not legitimately have supervised Silverman Chiropractic's business activities, because Silverman Chiropractic provided health care services, including medical services, that were beyond the scope of Silverman's chiropractic license.

58.     To the extent that Silverman ever had any kind of health care license, the only license he had was a chiropractic license. Silverman is not, and never has been, licensed as a physician.

59.     Even so, and in keeping with the fact that Silverman could not legitimately have supervised the business activities of Silverman Chiropractic, Silverman Chiropractic purported to provide medical services – such as medical examinations and pain management injections by the Treating Physicians and others – that were beyond the scope of Silverman's chiropractic license.

60.     Accordingly, Silverman Chiropractic operated in violation of the Clinic Act.

61.     In the claims identified in Exhibit "1", the Defendants' PIP charges were fraudulent and unlawful in that they misrepresented that Silverman Chiropractic was compliant with Florida law and eligible to receive PIP reimbursement in the first instance.

62.     In fact, Silverman Chiropractic never was compliant with Florida law or eligible to receive PIP reimbursement, because it operated in pervasive violation of the Clinic Act.

**B.     The Fraudulent and Unlawful Billing for Services Performed by Massage Therapists**

63.     What is more, many of the purported "physical therapy" services in the claims identified in Exhibit "1" were performed – to the extent they were performed at all – by massage therapists including Maray Palmero, LMT ("Palmero"), and unlicensed individuals, including Adela Aviles ("Aviles").

64. The Defendants were aware of the fact that Silverman Chiropractic could not legally recover PIP Benefits for any services performed by massage therapists or unsupervised unlicensed individuals.

65. As a result, and in order to conceal the fact that Palmero, Aviles, and other massage therapists and unsupervised/unlicensed individuals performed the purported "physical therapy" services that were unlawfully billed to GEICO through Silverman Chiropractic, the Defendants deliberately omitted any reference to Palmero, Aviles, and other massage therapists and unlicensed individuals associated with Silverman Chiropractic on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

66. Instead, in the claims for physical therapy services identified in Exhibit "1", the Defendants routinely falsely listed Silverman, Mazzotta, the Treating Chiropractors, or the Treating Physicians on the HCFA-1500 forms as the supposed providers or direct supervisors of the physical therapy services.

67. In the claims for the putative physical therapy services identified in Exhibit "1", the Defendants routinely fraudulently misrepresented that the services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i) in many cases, the purported physical therapy services were performed – to the extent they were performed at all – by massage therapists and unsupervised/unlicensed individuals, in contravention of Florida law;

(ii) Silverman Chiropractic could not lawfully recover PIP Benefits for the purported physical therapy services, because, in many cases, they were performed by massage therapists and unsupervised/unlicensed individuals; and

(iii) Silverman, Mazzotta, the Treating Chiropractors, and Treating Physicians systematically fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative physical therapy services.

68.     In this context, Silverman – who at all relevant times purported to own Silverman Chiropractic – did not, and could not have, legitimately supervised the business activities of Silverman Chiropractic.

69.     Had Silverman actually supervised the business activities of Silverman Chiropractic, Silverman would have noted – among other things – that the physical therapy services were often unlawfully performed by massage therapists and unsupervised/unlicensed individuals, and unlawfully billed to GEICO.

**C.     The Defendants' Unlawful General Business Practice of Failing to Make a Good-Faith Effort to Collect Co-Payments or Deductibles from Their Patients.**

70.     During the relevant time period, the Defendants unlawfully engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims statute.

71.     In keeping with this fact, in virtually all of the thousands of bills (i.e., the HCFA-1500 forms) submitted through Silverman Chiropractic to GEICO for the Defendants' Fraudulent Services, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the patient.

72.     In the claims identified in Exhibit "1", the Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because the Defendants engaged in the unlawful general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims statute.

**D.     The Defendants' Fraudulent Treatment and Billing Protocol**

73.     Most of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents. At the same time, almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced.

74.     Even so, the Defendants subjected the Insureds to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol.

75.     This pre-determined, fraudulent protocol was designed to maximize the billing that the Defendants could submit to insurers, including GEICO, not to benefit the Insureds who were subjected to it.

76.     The Defendants provided their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentation, or – in many cases – the total absence of any actual continuing medical problems arising from any automobile accidents.

77.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

78.     No legitimate chiropractor, physician, or clinic would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

79.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to continue profiting from their

fraudulent scheme, and because Silverman Chiropractic operated without legitimate supervision as required by the Clinic Act.

**1.      General Requirements for Patient Examinations Billed Under CPT Codes 99203, 99204 and 99213**

80.      As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

81.      The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

**(i)      CPT Code 99203**

82.      Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination typically represents that the Insured presented with problems of moderate severity.

83.      The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

84.      For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

  (i)      Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

  (ii)     Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

  (iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)     Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

85.     Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

86.     Moreover, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination typically represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

87.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination also represents that the physician or chiropractor who performed the examination conducted a "detailed" physical examination.

88.     Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician or chiropractor conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

89.     To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to minor musculoskeletal complaints.

90.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing

19

blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)  general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)  examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)  palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)  brief assessment of mental status;

(vi)  examination of gait and station;

(vii)  inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)  examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)  examination of sensation.

91.  Moreover, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination engaged in medical decision-making of "low complexity".

**(ii)  CPT Code 99204**

92.  Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial examination typically represents that the patient presented with problems of moderate to high severity.

93.  The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

94.     For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

95.     Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

96.     Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination typically represents that the physician or chiropractor who performed the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

97.     Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination also represents that the physician or chiropractor who performed the examination conducted a "comprehensive" physical examination.

98.     Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician or chiropractor either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

99.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a general examination of multiple patient organ systems unless the physician or chiropractor has documented findings with respect to at least eight organ systems.

100.    The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)    genitourinary;

(viii)   musculoskeletal;

(ix)     integumentary (skin and/or breast);

(x)      neurological;

(xi)     psychiatric;

(xii)    endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)    allergic/immunologic

101.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician or chiropractor has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

102.    Additionally, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or chiropractor who performed the examination engaged in "moderate complexity" medical decision-making.

**(iii)    CPT Code 99213**

103.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

104.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

105.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

106.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination also represents that the examining physician or chiropractor performed at least two of the following three tasks during the examination: (a) took an "expanded problem focused" patient history; (b) conducted an "expanded problem focused physical examination"; and (c) engaged in medical decision-making of "low complexity".

**2.       The Fraudulent Treatment and Billing Protocol at Silverman Chiropractic**

**(i)       The Fraudulent Charges for Initial Examinations at Silverman Chiropractic**

107.    As an initial step in their fraudulent treatment and billing protocol, the Defendants purported to provide each of the Insureds in the claims identified in Exhibit "1" with an initial examination.

108.    As set forth in Exhibit "1", the Defendants then billed many of the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT Code 99203, typically resulting in a charge of between $85.00 to $1,130.00 for each initial examination that they purported to provide.

109.     As set forth in Exhibit "1", the Defendants also billed many of their purported initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99204, typically resulting in a charge of between $400.00 or $1,130.00 for each initial examination they purported to provide.

110.    In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented that Silverman Chiropractic was eligible to collect PIP benefits in the first instance.

111.    In fact, and as set forth above, Silverman Chiropractic was never eligible to collect PIP benefits, inasmuch as it operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act.

112.    As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

### a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems

113.     To the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains or strains.

114.     For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low or minimal severity, in many of the claims identified in Exhibit "1" the contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

115.     What is more, in most of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

116.     To the limited extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis, and then discharged with nothing more serious than a minor soft tissue injury diagnosis.

117.     Even so, in the claims for initial examinations identified in Exhibit "1", the Defendants routinely billed for their putative examinations using CPT Code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

118.     For example:

(i)      On June 5, 2017, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RM's vehicle did not deploy and that RM's vehicle was drivable following the accident. The police report further indicated that RM did not complain of any pain at the scene of the accident. In keeping with the fact that RM was not seriously injured in the accident, RM did not visit any hospital emergency room following the accident. To the extent

that RM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of RM on June 5, 2017, Silverman Chiropractic, Silverman, and Mazzotta billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ii)     On November 8, 2017, an Insured named LJ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LJ's vehicle did not deploy and that LJ's vehicle was drivable following the accident. The police report further indicated that LJ did not complain of any pain at the scene of the accident. In keeping with the fact that LJ was not seriously injured in the accident, LJ did not visit any hospital emergency room following the accident. To the extent that LJ experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LJ on November 8, 2017, Silverman Chiropractic, Silverman, and Mazzotta billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iii)    On June 20, 2018, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JH's vehicle did not deploy and that JH's vehicle was drivable following the accident. The police report further indicated that JH did not complain of any pain at the scene of the accident. In keeping with the fact that JH was not seriously injured in the accident, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JH on June 25, 2018, Silverman Chiropractic, Silverman, and Quintana billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iv)    On January 12, 2019, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JL's's vehicle did not deploy and that JL's's vehicle was drivable following the accident. The police report further indicated that JL did not complain of any pain at the scene of the accident. In keeping with the fact that JL was not seriously injured in the accident, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JL on January 14, 2019, Silverman Chiropractic, Silverman, and Mazzotta billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(v)     On January 12, 2019, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JO's vehicle did not deploy and that JO's vehicle was drivable following the accident. The police

report further indicated that JO did not complain of any pain at the scene of the accident. In keeping with the fact that JO was not seriously injured in the accident, JO did not visit any hospital emergency room following the accident. To the extent that JO experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JO on January 23, 2019, Silverman Chiropractic, Silverman, and Mazzotta billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vi)     On January 12, 2019, an Insured named PB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in PB's vehicle did not deploy and that PB's vehicle was drivable following the accident. The police report further indicated that PB did not complain of any pain at the scene of the accident. In keeping with the fact that PB was not seriously injured in the accident, PB did not visit any hospital emergency room following the accident. To the extent that PB experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of PB on January 14, 2019, Silverman Chiropractic, Silverman, and Mazzotta billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vii)    On May 3, 2019, an Insured named WP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in WP's vehicle did not deploy and that WP's vehicle was drivable following the accident. The police report further indicated that WP did not complain of any pain at the scene of the accident. In keeping with the fact that WP was not seriously injured in the accident, WP did not visit any hospital emergency room following the accident. To the extent that WP experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of WP on May 8, 2019, Silverman Chiropractic, Silverman, and Mazzotta billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(viii)   On August 8, 2019, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AC's vehicle did not deploy and that AC's vehicle was drivable following the accident. The police report further indicated that AC did not complain of any pain at the scene of the accident. In keeping with the fact that AC was not seriously injured in the accident, AC did not visit any hospital emergency room following the accident. To the extent that AC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AC on August 14, 2019, Silverman Chiropractic, Silverman, and Mazzotta billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ix)    On October 10, 2019, an Insured named GM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GM's vehicle did not deploy and that GM's vehicle was drivable following the accident. The police report further indicated that GM did not complain of any pain at the scene of the accident. In keeping with the fact that GM was not seriously injured in the accident, GM did not visit any hospital emergency room following the accident. To the extent that GM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of GM on August 14, 2019, Silverman Chiropractic, Silverman, and Quintana billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(x)     On March 11, 2020, an Insured named BH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in BH's vehicle did not deploy and that BH's vehicle was drivable following the accident. The police report further indicated that BH did not complain of any pain at the scene of the accident. In keeping with the fact that BH was not seriously injured in the accident, BH did not visit any hospital emergency room following the accident. To the extent that BH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of BH on March 16, 2020, Silverman Chiropractic, Silverman, and Mazzotta billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xi)    On June 16, 2020, an Insured named AL was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AL's vehicle did not deploy and that AL's vehicle was drivable following the accident. The police report further indicated that AL did not complain of any pain at the scene of the accident. In keeping with the fact that AL was not seriously injured in the accident, AL did not visit any hospital emergency room following the accident. To the extent that AL experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AL on June 24, 2020, Silverman Chiropractic, Silverman, and Mazzotta billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xii)   On February 10, 2021, an Insured named LD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LD's vehicle did not deploy and that LD's vehicle was drivable following the accident. The police report further indicated that LD did not complain of any pain at the scene of the accident. In keeping with the fact that LD was not seriously injured in the accident, LD did not visit any hospital emergency room following the accident. To the extent that LD experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LD on February 12, 2021, Silverman Chiropractic, Silverman, and

Mazzotta billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xiii)   On April 11, 2021, an Insured named LR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LR's vehicle did not deploy and that LR's vehicle was drivable following the accident. The police report further indicated that LR did not complain of any pain at the scene of the accident. In keeping with the fact that LR was not seriously injured in the accident, LR did not visit any hospital emergency room following the accident. To the extent that LR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LR on April 12, 2021, Silverman Chiropractic, Silverman, and Mazzotta billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xiv)   On September 10, 2022, an Insured named GR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GR's vehicle did not deploy and that GR's vehicle was drivable following the accident. The police report further indicated that GR did not complain of any pain at the scene of the accident. In keeping with the fact that GR was not seriously injured in the accident, GR did not visit any hospital emergency room following the accident. To the extent that GR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of GR on September 12, 2022, Silverman Chiropractic, Silverman, and Mazzotta billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xv)   On March 22, 2023, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JP's vehicle did not deploy and that JP's vehicle was drivable following the accident. The police report further indicated that JP did not complain of any pain at the scene of the accident. In keeping with the fact that JP was not seriously injured in the accident, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JP on March 27, 2023, Silverman Chiropractic, Silverman, and Mazzotta billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

119.   These are only representative examples. In the claims for initial examinations identified in Exhibit "1", the Defendants routinely falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low or minimal

severity soft tissue injuries such as sprains and strains, to the limited extent that they had any real presenting problems at all.

120.     Similarly, in the claims for initial examinations identified in Exhibit "1", Silverman and Silverman Chiropractic routinely billed for their putative examinations using CPT Code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

121.     For example:

(i)     On March 11, 2020, an Insured named PH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in PH's vehicle did not deploy and that PH's vehicle was drivable following the accident. The police report further indicated that PH did not complain of any pain at the scene of the accident. In keeping with the fact that PH was not seriously injured in the accident, PH did not visit any hospital emergency room following the accident. To the extent that PH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of PH on April 15, 2020, Silverman Chiropractic, Silverman, and Ibraheim billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

(ii)    On June 16, 2020, an Insured named AL was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AL's vehicle did not deploy and that AL's vehicle was drivable following the accident. The police report further indicated that AL did not complain of any pain at the scene of the accident. In keeping with the fact that AL was not seriously injured in the accident, AL did not visit any hospital emergency room following the accident. To the extent that AL experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AL on June 24, 2020, Silverman Chiropractic, Silverman, and Benjamin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

(iii)   On February 10, 2021, an Insured named LD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LD's vehicle did not deploy and that LD's vehicle was drivable following the accident. The police report further indicated that LD did not complain of any pain at the scene of the accident. In keeping with the fact that LD was not seriously injured in the accident, LD did not visit any hospital emergency room following the accident. To

the extent that LD experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LD on February 12, 2021, Silverman Chiropractic, Silverman, and Ibraheim billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

(iv)     On April 11, 2021, an Insured named LR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LR's vehicle did not deploy and that LR's vehicle was drivable following the accident. The police report further indicated that LR did not complain of any pain at the scene of the accident. In keeping with the fact that LR was not seriously injured in the accident, LR did not visit any hospital emergency room following the accident. To the extent that LR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LR on April 14, 2021, Silverman Chiropractic, Silverman, and Benjamin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems. What is more, following a purported initial examination of LR on June 21, 2021, Silverman Chiropractic, Silverman, and Ibraheim billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

(v)     On May 27, 2021, an Insured named EC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in EC's vehicle did not deploy. The police report further indicated that EC did not complain of any pain at the scene of the accident, and in fact refused medical attention at the scene of the accident. In keeping with the fact that EC was not seriously injured in the accident, EC visited Baptist Health Urgent Care the following day, where she was briefly observed on an outpatient basis and was diagnosed with nothing more serious than a cervical, chest wall, and shoulder strain. To the extent that EC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of EC on June 25, 2021, Silverman Chiropractic, Silverman, and Ibraheim billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination involved moderate to high severity presenting problems.

122.     These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Silverman and Silverman Chiropractic routinely billed for their purported examinations using CPT Code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low or

minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all as the result of any automobile accidents.

123.    In the claims for initial examinations identified in Exhibit "1", the Defendants routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

124.    In the claims for initial examinations identified in Exhibit "1", the Defendants also routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

125.    What is more, in the claims identified in Exhibit "1", the charges for the initial examinations under CPT code 99203 misrepresented and exaggerated the amount of face-to-face time that the examining physician or chiropractor spent with the Insureds or the Insureds' families.

126.    As set forth in Exhibit "1", the Defendants typically billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician or chiropractor who purported to conduct the examinations spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations.

127.    Moreover, as set forth in Exhibit "1", Silverman and Silverman Chiropractic billed for many of their putative initial examinations using CPT code 99204, and thereby represented

that the physicians who purported to conduct the examinations spent at least 45 minutes of face-to-face time with the Insureds or their families during the examinations.

128.    In fact, in the initial examinations identified in Exhibit "1", the physicians and chiropractors who purported to perform the initial examinations on behalf of Silverman Chiropractic almost never spent more than 15-20 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 30 or 45 minutes.

129.    In keeping with the fact that the initial examinations in the claims identified in Exhibit "1" did not involve more than 15-20 minutes of face-to-face time with the Insureds, or the Insureds' families, to the extent that they were provided at all, Silverman, Mazzotta, the Treating Physicians, and the Treating Chiropractors used template forms in conducting the examinations.

130.    All that was required to complete the template forms was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

131.    These interviews and examinations did not require Silverman, Mazzotta, the Treating Physicians, the Treating Chiropractors, or any other health care providers associated with Silverman Chiropractic to spend more than 15-20 minutes of face-to-face time with the Insureds during the putative initial examinations.

132.    In the claims for initial examinations that are identified in Exhibit "1", the Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that take less time to perform.

c.    **Misrepresentations Regarding "Detailed" and "Comprehensive" Physical Examinations**

133.    Moreover, the claims identified in Exhibit "1" for initial examinations under CPT codes 99203 and 99204 routinely falsely represented the extent and results of the underlying physical examinations.

134.    As set forth in Exhibit "1", the Defendants typically billed for their putative initial examinations using CPT code 99203, and thereby represented that the physicians and chiropractors who purported to conduct the examinations conducted a "detailed" physical examination of the Insureds who purportedly received the examinations.

135.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", no one conducted any extended examinations of the Insureds' musculoskeletal systems or any of their other systems.

136.    For instance, in the claims under CPT code 99203 identified in Exhibit "1", the physicians or chiropractors who purported to perform the initial examinations on behalf of Silverman Chiropractic (e.g., Silverman, Mazzotta, the Treating Physicians, and the Treating Chiropractors) did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(ii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iii)    brief assessment of mental status;

(iv)    examination of gait and station;

(v)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and

neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(vi)     coordination;

(vii)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(viii)   examination of sensation.

137.    For example:

(i)      On or about June 5, 2017, the Defendants billed GEICO under CPT code 99203 for an initial examination that Mazzotta purported to provide to an Insured named RM at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to RM. However, Mazzotta did not document an extended examination of RM's musculoskeletal system, despite the fact that – to the extent RM had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(ii)    On or about November 8, 2017, the Defendants billed GEICO under CPT code 99203 for an initial examination that Mazzotta purported to provide to an Insured named LJ at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to LJ. However, Mazzotta did not document an extended examination of LJ's musculoskeletal system, despite the fact that – to the extent LJ had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(iii)   On or about June 25, 2018, Silverman and Silverman Chiropractic billed GEICO under CPT code 99203 for an initial examination that Quintana purported to provide to an Insured named JH at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to JH. However, Quintana did not document an extended examination of JH's musculoskeletal system, despite the fact that – to the extent JH had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(iv)   On or about January 14, 2019, the Defendants billed GEICO under CPT code 99203 for an initial examination that Mazzotta purported to provide to an Insured named JL at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to JL. However, Mazzotta did not document an extended examination of JL's musculoskeletal system, despite the fact that – to the extent JL had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(v)    On or about January 14, 2019, the Defendants billed GEICO under CPT code 99203 for an initial examination that Mazzotta purported to provide to an Insured named

PB at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to PB. However, Mazzotta did not document an extended examination of PB's musculoskeletal system, despite the fact that – to the extent PB had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(vi)     On or about January 23, 2019, the Defendants billed GEICO under CPT code 99203 for an initial examination that Mazzotta purported to provide to an Insured named JO at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to JO. However, Mazzotta did not document an extended examination of JO's musculoskeletal system, despite the fact that – to the extent JO had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(vii)    On or about May 8, 2019, Silverman and Silverman Chiropractic billed GEICO under CPT code 99203 for an initial examination that Bressler purported to provide to an Insured named WP at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to WP. However, Bressler did not document an extended examination of WP's musculoskeletal system, despite the fact that – to the extent WP had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(viii)   On or about August 14, 2019, the Defendants billed GEICO under CPT code 99203 for an initial examination that Mazzotta purported to provide to an Insured named AC at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to AC. However, Mazzotta did not document an extended examination of AC's musculoskeletal system, despite the fact that – to the extent AC had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(ix)     On or about October 15, 2019, Silverman and Silverman Chiropractic billed GEICO under CPT code 99203 for an initial examination that Quintana purported to provide to an Insured named GM at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to GM. However, Quintana did not document an extended examination of GM's musculoskeletal system, despite the fact that – to the extent GM had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(x)      On or about March 16, 2020, the Defendants billed GEICO under CPT code 99203 for an initial examination that Mazzotta purported to provide to an Insured named BH at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to BH. However, Mazzotta did not document an extended examination of BH's musculoskeletal system, despite the fact that – to the extent BH had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(xi)     On or about June 23, 2020, the Defendants billed GEICO under CPT code 99203 for an initial examination that Mazzotta purported to provide to an Insured named AL at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to AL. However, Mazzotta did not document an extended examination of AL's musculoskeletal system, despite the fact that – to the extent AL had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(xii)    On or about February 12, 2021, the Defendants billed GEICO under CPT code 99203 for an initial examination that Mazzotta purported to provide to an Insured named LD at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to LD. However, Mazzotta did not document an extended examination of LD's musculoskeletal system, despite the fact that – to the extent LD had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(xiii)   On or about April 12, 2021, the Defendants billed GEICO under CPT code 99203 for an initial examination that Mazzotta purported to provide to an Insured named LR at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to LR. However, Mazzotta did not document an extended examination of LR's musculoskeletal system, despite the fact that – to the extent LR had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(xiv)    On or about September 12, 2022, the Defendants billed GEICO under CPT code 99203 for an initial examination that Mazzotta purported to provide to an Insured named GR at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to GR. However, Mazzotta did not document an extended examination of GR's musculoskeletal system, despite the fact that – to the extent GR had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(xv)     On or about March 27, 2023, the Defendants billed GEICO under CPT code 99203 for an initial examination that Mazzotta purported to provide to an Insured named JP at Silverman Chiropractic, and thereby represented that they had provided a "detailed" physical examination to JP. However, Mazzotta did not document an extended examination of JP's musculoskeletal system, despite the fact that – to the extent JP had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

138.    These are only representative examples. In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", the Defendants routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed

physical examinations because the examining physicians and chiropractors had not documented an extended examination of the Insureds' affected body areas and other symptomatic or related organ systems.

139.    Moreover, as set forth in Exhibit "1", Silverman and Silverman Chiropractic also billed for many of their putative initial examinations using CPT code 99204, and thereby represented that the physicians who purported to conduct the examinations conducted a "comprehensive" physical examination of the Insureds who purportedly received the examinations.

140.    In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibit "1", the physicians who purported to perform the initial examinations on behalf of Silverman Chiropractic did not conduct: (i) a general examination of multiple patient organ systems; or (ii) a complete examination of a single patient organ system.

141.    For example:

(i)     On or about April 15, 2020, Silverman and Silverman Chiropractic billed GEICO under CPT code 99204 for an initial examination that Ibraheim purported to provide to an Insured named PH, and thereby represented that Ibraheim had performed a "comprehensive" physical examination on PH. However, Ibraheim did not document findings with respect to at least eight of PH's organ systems, nor did he document a "complete" examination of PH's musculoskeletal system or any of PH's other organ systems.

(ii)    On or about June 24, 2020, Silverman and Silverman Chiropractic billed GEICO under CPT code 99204 for an initial examination that Benjamin purported to provide to an Insured named AL, and thereby represented that Benjamin had performed a "comprehensive" physical examination on AL. However, Benjamin did not document findings with respect to at least eight of AL's organ systems, nor did he document a "complete" examination of AL's musculoskeletal system or any of AL's other organ systems.

(iii)   On or about March 1, 2021, Silverman and Silverman Chiropractic billed GEICO under CPT code 99204 for an initial examination that Ibraheim purported to provide to an Insured named LD, and thereby represented that Ibraheim had performed a "comprehensive" physical examination on LD. However, Ibraheim did not

document findings with respect to at least eight of LD's organ systems, nor did he document a "complete" examination of LD's musculoskeletal system or any of LD's other organ systems.

(iv)     On or about April 14, 2021, Silverman and Silverman Chiropractic billed GEICO under CPT code 99204 for an initial examination that Benjamin purported to provide to an Insured named LR, and thereby represented that Benjamin had performed a "comprehensive" physical examination on LR. However, Benjamin did not document findings with respect to at least eight of LR's organ systems, nor did he document a "complete" examination of LR's musculoskeletal system or any of LR's other organ systems. What is more, on June 21, 2021, Silverman and Silverman Chiropractic billed GEICO under CPT code 99204 for an initial examination that Ibraheim purported to provide to LR, and thereby represented that Ibraheim had performed a "comprehensive" physical examination on LR. However, Ibraheim did not document findings with respect to at least eight of LR's organ systems, nor did he document a "complete" examination of LR's musculoskeletal system or any of LR's other organ systems.

(v)      On or about October 11, 2021, Silverman and Silverman Chiropractic billed GEICO under CPT code 99204 for an initial examination that Bressler purported to provide to an Insured named EC, and thereby represented that Bressler had performed a "comprehensive" physical examination on EC. However, Bressler did not document findings with respect to at least eight of EC's organ systems, nor did he document a "complete" examination of EC's musculoskeletal system or any of EC's other organ systems.

142.    These are only representative examples. In the claims for initial examinations under CPT code 99204 that are identified in Exhibit "1", Silverman and Silverman Chiropractic routinely falsely represented that they had provided "comprehensive" physical examinations. In fact, they had not provided comprehensive physical examinations because the examining physicians had not documented: (i) a general examination of multiple patient organ systems; or (ii) a complete examination of a single patient organ system.

143.    In the claims for initial examinations under CPT code 99203 and 99204 that are identified in Exhibit "1", the Defendants falsely represented that they had provided "detailed" or "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable

under CPT codes 99203 and 99204 are reimbursable at a higher rate than examinations that do not require the examining physician or chiropractor to provide "detailed" or "comprehensive" physical examinations.

**d.   Misrepresentations Regarding the Extent of Medical Decision-Making**

144.   Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

145.   As set forth above, and in Exhibit "1" most of the initial examinations that the Defendants billed through Silverman Chiropractic to GEICO were billed under CPT code 99203, which represented that the examining physicians or chiropractors engaged in some genuine, low-complexity medical decision-making during the initial examinations.

146.   Moreover, as set forth above, and in Exhibit "1", many of the initial examinations billed through Silverman Chiropractic to GEICO were billed under CPT code 99204, which represented that the examining physicians engaged in some genuine, moderate-complexity medical decision-making during the initial examinations.

147.   In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

148.   First, in the claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of a significant amount of medical records, diagnostic tests, or other information.

149.    When the Insureds in the claims identified in Exhibit "1" presented to Silverman Chiropractic for "treatment", they did not arrive with any significant amount of medical records.

150.    Second, in the claims for initial examinations identified in Exhibit "1", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they actually presented with any ongoing complaints arising from automobile accidents at all.

151.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided at Silverman Chiropractic, to the extent that Silverman Chiropractic provided any such diagnostic procedures or treatment options in the first instance.

152.    In virtually all of the claims identified in Exhibit "1", any diagnostic procedures and "treatments" that the Defendants actually provided were limited to a series of medically unnecessary follow-up examinations, chiropractic treatments, physical therapy treatments, and pain management treatments, none of which was health- or life-threatening if properly provided.

153.    Third, in the claims for initial examinations identified in Exhibit "1", the Treating Physicians, Treating Chiropractors, Mazzotta, and Silverman did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

154.    Rather, to the extent that the initial examinations were conducted in the first instance, Silverman, Mazzotta, the Treating Physicians, and Treating Chiropractors provided a substantially similar, pre-determined set of phony, objectively unverifiable soft tissue injury "diagnoses" for the Insureds, and a substantially similar course of treatment for the Insureds.

155.    Specifically, in the claims identified in Exhibit "1", during the initial examinations the Insureds routinely did not report any significant continuing medical problems that legitimately could be traced to an underlying automobile accident.

156.    Even so, Silverman, Mazzotta, and the Treating Physicians and Treating Chiropractors at Silverman's direction, prepared initial examination reports in which they provided phony, boilerplate, objectively unverifiable soft tissue injury "diagnoses" to virtually every Insured.

157.    Then, based upon these false "diagnoses", the Defendants caused virtually every Insured to receive significant and medically unnecessary physical therapy treatment and, in some cases at Silverman Chiropractic, nerve conduction studies and pain management injections.

158.    For example:

(i)    On June 5, 2017, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RM's vehicle did not deploy and that RM's vehicle was drivable following the accident. The police report further indicated that RM did not complain of any pain at the scene of the accident. In keeping with the fact that RM was not seriously injured in the accident, RM did not visit any hospital emergency room following the accident. To the extent that RM experienced any health problems at all as a result of the accident, they were of low or minimal severity. On June 5, 2017, Mazzotta purported to conduct an initial examination of RM at Silverman Chiropractic. To the extent that Mazzotta performed the examination in the first instance, Mazzotta did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mazzotta did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mazzotta, Silverman, and Silverman Chiropractic provided RM with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither RM's presenting problems, nor the treatment plan provided to RM by Silverman, Mazzotta, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, RM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Silverman, Silverman Chiropractic, and Mazzotta consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to RM. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mazzotta

engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)   On November 8, 2017, an Insured named LJ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LJ's vehicle did not deploy and that LJ's vehicle was drivable following the accident. The police report further indicated that LJ did not complain of any pain at the scene of the accident. In keeping with the fact that LJ was not seriously injured in the accident, LJ did not visit any hospital emergency room following the accident. To the extent that LJ experienced any health problems at all as a result of the accident, they were of low or minimal severity. On November 8, 2017, Mazzotta purported to conduct an initial examination of LJ at Silverman Chiropractic. To the extent that Mazzotta performed the examination in the first instance, Mazzotta did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mazzotta did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mazzotta, Silverman, and Silverman Chiropractic provided LJ with substantially the same, phony, objectively unverifiable list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither LJ's presenting problems, nor the treatment plan provided to LJ by Silverman, Mazzotta, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, LJ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Silverman, Silverman Chiropractic, and Mazzotta consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to LJ. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mazzotta engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)  On June 20, 2018, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JH's vehicle did not deploy and that JH's vehicle was drivable following the accident. The police report further indicated that JH did not complain of any pain at the scene of the accident. In keeping with the fact that JH was not seriously injured in the accident, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of low or minimal severity. On June 25, 2018, Quintana purported to conduct an initial examination of JH at Silverman Chiropractic. To the extent that Quintana performed the examination in the first instance, Quintana did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Quintana did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Quintana, Silverman, and Silverman Chiropractic provided JH with substantially the same, phony, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore,

neither JH's presenting problems, nor the treatment plan provided to JH by Silverman, Quintana, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, JH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Silverman, Quintana, and Silverman Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to JH. Even so, Silverman and Silverman Chiropractic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Quintana engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)   On January 12, 2019, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JL's's vehicle did not deploy and that JL's's vehicle was drivable following the accident. The police report further indicated that JL did not complain of any pain at the scene of the accident. In keeping with the fact that JL was not seriously injured in the accident, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as a result of the accident, they were of low or minimal severity. On January 14, 2019, Mazzotta purported to conduct an initial examination of JL at Silverman Chiropractic. To the extent that Mazzotta performed the examination in the first instance, Mazzotta did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mazzotta did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mazzotta, Silverman, and Silverman Chiropractic provided JL with substantially the same, phony, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither JL's presenting problems, nor the treatment plan provided to JL by Mazzotta, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, JL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Mazzotta, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to JL. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mazzotta engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)   On January 12, 2019, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JO's vehicle did not deploy and that JO's vehicle was drivable following the accident. The police report further indicated that JO did not complain of any pain at the scene of the accident. In keeping with the fact that JO was not seriously injured in the accident, JO did not visit any hospital emergency room following the accident. To the extent that JO experienced any health problems at all as a result of the accident, they were of low or minimal severity. On January 23, 2019, Mazzotta purported to conduct

an initial examination of JO at Silverman Chiropractic. To the extent that Mazzotta performed the examination in the first instance, Mazzotta did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mazzotta did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mazzotta, Silverman, and Silverman Chiropractic provided JO with substantially the same, phony, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither JO's presenting problems, nor the treatment plan provided to JO by Mazzotta, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, JO did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Mazzotta, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to JO. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mazzotta engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)  On January 12, 2019, an Insured named PB was involved in an automobile accident. The contemporaneous police report indicated that the airbags in PB's vehicle did not deploy and that PB's vehicle was drivable following the accident. The police report further indicated that PB did not complain of any pain at the scene of the accident. In keeping with the fact that PB was not seriously injured in the accident, PB did not visit any hospital emergency room following the accident. To the extent that PB experienced any health problems at all as a result of the accident, they were of low or minimal severity. On January 14, 2019, Mazzotta purported to conduct an initial examination of PB at Silverman Chiropractic. To the extent that Mazzotta performed the examination in the first instance, Mazzotta did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mazzotta did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mazzotta, Silverman, and Silverman Chiropractic provided PB with substantially the same, phony, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither PB's presenting problems, nor the treatment plan provided to PB by Mazzotta, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, PB did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Mazzotta, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to PB. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mazzotta engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)    On May 3, 2019, an Insured named WP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in WP's vehicle did not deploy and that WP's vehicle was drivable following the accident. The police report further indicated that WP did not complain of any pain at the scene of the accident. In keeping with the fact that WP was not seriously injured in the accident, WP did not visit any hospital emergency room following the accident. To the extent that WP experienced any health problems at all as a result of the accident, they were of low or minimal severity. On May 8, 2019, Bressler purported to conduct an initial examination of WP at Silverman Chiropractic. To the extent that Bressler performed the examination in the first instance, Bressler did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Bressler did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Bressler, Silverman, and Silverman Chiropractic provided WP with substantially the same, phony, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither WP's presenting problems, nor the treatment plan provided to WP by Bressler, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, WP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Bressler, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic, physical therapy services, and nerve conduction velocity testing, which did not pose a significant risk to WP. Even so, Silverman and Silverman Chiropractic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Bressler engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)    On August 8, 2019, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AC's vehicle did not deploy and that AC's vehicle was drivable following the accident. The police report further indicated that AC did not complain of any pain at the scene of the accident. In keeping with the fact that AC was not seriously injured in the accident, AC did not visit any hospital emergency room following the accident. To the extent that AC experienced any health problems at all as a result of the accident, they were of low or minimal severity. On August 14, 2019, Mazzotta purported to conduct an initial examination of AC at Silverman Chiropractic. To the extent that Mazzotta performed the examination in the first instance, Mazzotta did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mazzotta did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mazzotta, Silverman, and Silverman Chiropractic provided AC with substantially the same, phony, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither AC's presenting problems, nor the treatment plan provided to AC by Mazzotta, Silverman, and Silverman Chiropractic presented any risk of significant

complications, morbidity, or mortality. To the contrary, AC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Mazzotta, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic, physical therapy services, and nerve conduction velocity testing, which did not pose a significant risk to AC. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mazzotta engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)     On October 10, 2019, an Insured named GM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GM's vehicle did not deploy and that GM's vehicle was drivable following the accident. The police report further indicated that GM did not complain of any pain at the scene of the accident. In keeping with the fact that GM was not seriously injured in the accident, GM did not visit any hospital emergency room following the accident. To the extent that GM experienced any health problems at all as a result of the accident, they were of low or minimal severity. On October 15, 2019, Quintana purported to conduct an initial examination of GM at Silverman Chiropractic. To the extent that Quintana performed the examination in the first instance, Quintana did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Quintana did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Quintana, Silverman, and Silverman Chiropractic provided GM with substantially the same, phony, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither GM's presenting problems, nor the treatment plan provided to GM by Quintana, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, GM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Quintana, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to GM. Even so, Silverman and Silverman Chiropractic billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Quintana engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)      On March 11, 2020, an Insured named BH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in BH's vehicle did not deploy and that BH's vehicle was drivable following the accident. The police report further indicated that BH did not complain of any pain at the scene of the accident. In keeping with the fact that BH was not seriously injured in the accident, BH did not visit any hospital emergency room following the accident. To the extent that BH experienced any health problems at all as a result of the accident, they were of low or minimal severity. On March 16, 2020, Mazzotta purported to conduct an initial examination of BH at Silverman Chiropractic. To the extent that Mazzotta performed the examination in the first instance, Mazzotta did not retrieve, review,

or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mazzotta did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mazzotta, Silverman, and Silverman Chiropractic provided BH with substantially the same, phony, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither BH's presenting problems, nor the treatment plan provided to BH by Mazzotta, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, BH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Mazzotta, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to BH. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mazzotta engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)     On June 16, 2020, an Insured named AL was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AL's vehicle did not deploy and that AL's vehicle was drivable following the accident. The police report further indicated that AL did not complain of any pain at the scene of the accident. In keeping with the fact that AL was not seriously injured in the accident, AL did not visit any hospital emergency room following the accident. To the extent that AL experienced any health problems at all as a result of the accident, they were of low or minimal severity. On June 23, 2020, Mazzotta purported to conduct an initial examination of AL at Silverman Chiropractic. To the extent that Mazzotta performed the examination in the first instance, Mazzotta did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mazzotta did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mazzotta, Silverman, and Silverman Chiropractic provided AL with substantially the same, phony, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither AL's presenting problems, nor the treatment plan provided to AL by Mazzotta, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, AL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Mazzotta, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to AL. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mazzotta engaged in some legitimate, low complexity medical decision-making during the purported examination. What is more, on June 24, 2020, Benjamin purported to conduct an initial examination of AL at Silverman Chiropractic. To the extent that Benjamin performed the examination in the first instance, Benjamin did not retrieve, review, or analyze any significant amount of medical records, diagnostic

tests, or other information in connection with the examination. Moreover, Benjamin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Benjamin, Silverman, and Silverman Chiropractic provided AL with substantially the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AL's presenting problems, nor the treatment plan provided to AL by Benjamin, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, AL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Benjamin, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to AL. Even so, Silverman and Silverman Chiropractic billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Benjamin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xii)   On February 10, 2021, an Insured named LD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LD's vehicle did not deploy and that LD's vehicle was drivable following the accident. The police report further indicated that LD did not complain of any pain at the scene of the accident. In keeping with the fact that LD was not seriously injured in the accident, LD did not visit any hospital emergency room following the accident. To the extent that LD experienced any health problems at all as a result of the accident, they were of low or minimal severity. On February 12, 2021, Mazzotta purported to conduct an initial examination of LD at Silverman Chiropractic. To the extent that Mazzotta performed the examination in the first instance, Mazzotta did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mazzotta did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mazzotta, Silverman, and Silverman Chiropractic provided LD with substantially the same, phony, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither LD's presenting problems, nor the treatment plan provided to LD by Mazzotta, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, LD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Mazzotta, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic, physical therapy services, and nerve conduction velocity tests, which did not pose a significant risk to LD. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mazzotta engaged in some legitimate, low complexity medical decision-making during the purported examination.  What is more, on March 1, 2021, Ibraheim purported to conduct an initial examination of LD at Silverman Chiropractic. To the extent that Ibraheim performed the examination in the first instance, Ibraheim did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in

connection with the examination. Moreover, Ibraheim did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ibraheim, Silverman, and Silverman Chiropractic provided LD with substantially the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LD's presenting problems, nor the treatment plan provided to LD by Ibraheim, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, LD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Ibraheim, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to LD. Even so, Silverman and Silverman Chiropractic billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ibraheim engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiii)  On April 11, 2021, an Insured named LR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LR's vehicle did not deploy and that LR's vehicle was drivable following the accident. The police report further indicated that LR did not complain of any pain at the scene of the accident. In keeping with the fact that LR was not seriously injured in the accident, LR did not visit any hospital emergency room following the accident. To the extent that LR experienced any health problems at all as a result of the accident, they were of low or minimal severity. On April 12, 2021, Mazzotta purported to conduct an initial examination of LR at Silverman Chiropractic. To the extent that Mazzotta performed the examination in the first instance, Mazzotta did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mazzotta did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mazzotta, Silverman, and Silverman Chiropractic provided LR with substantially the same, phony, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither LR's presenting problems, nor the treatment plan provided to LR by Mazzotta, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, LR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Mazzotta, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to LR. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mazzotta engaged in some legitimate, low complexity medical decision-making during the purported examination. What is more, on April 14, 2021, Benjamin purported to conduct an initial examination of LR at Silverman Chiropractic. To the extent that Benjamin performed the examination in the first instance, Benjamin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Benjamin

did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Benjamin, Silverman, and Silverman Chiropractic provided LR with substantially the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LR's presenting problems, nor the treatment plan provided to LR by Benjamin, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, LR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Benjamin, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to LR. Even so, Silverman and Silverman Chiropractic billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Benjamin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiv)  On September 10, 2022, an Insured named GR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GR's vehicle did not deploy and that GR's vehicle was drivable following the accident. The police report further indicated that GR did not complain of any pain at the scene of the accident. In keeping with the fact that GR was not seriously injured in the accident, GR did not visit any hospital emergency room following the accident. To the extent that GR experienced any health problems at all as a result of the accident, they were of low or minimal severity. On September 12, 2022, Mazzotta purported to conduct an initial examination of GR at Silverman Chiropractic. To the extent that Mazzotta performed the examination in the first instance, Mazzotta did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mazzotta did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mazzotta, Silverman, and Silverman Chiropractic provided GR with substantially the same, phony, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither GR's presenting problems, nor the treatment plan provided to GR by Mazzotta, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, GR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Mazzotta, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to GR. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mazzotta engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv)  On March 22, 2023, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JP's vehicle did not deploy and that JP's vehicle was drivable following the accident. The police report further indicated that JP did not complain of any pain at the scene of the

accident. In keeping with the fact that JP was not seriously injured in the accident, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all as a result of the accident, they were of low or minimal severity. On March 16, 2020, Mazzotta purported to conduct an initial examination of JP at Silverman Chiropractic. To the extent that Mazzotta performed the examination in the first instance, Mazzotta did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mazzotta did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mazzotta, Silverman, and Silverman Chiropractic provided JP with substantially the same, phony, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither JP's presenting problems, nor the treatment plan provided to JP by Mazzotta, Silverman, and Silverman Chiropractic presented any risk of significant complications, morbidity, or mortality. To the contrary, JP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Mazzotta, Silverman, and Silverman Chiropractic consisted of medically unnecessary chiropractic and physical therapy services, which did not pose a significant risk to JP. Even so, the Defendants billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mazzotta engaged in some legitimate, low complexity medical decision-making during the purported examination.

159.    In a legitimate clinical setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

160.    It generally is inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

161.    Even so, in the claims identified in Exhibit "1", the Defendants routinely directed Insureds to immediately begin a course of physical therapy often within days of their accident, or even on the same day of their accident, before the Insureds had first tried a more conservative course of treatment.

162.    The Defendants routinely directed Insureds to immediately begin a course of physical therapy often within days of their accidents, or even on the same day of their accidents, because their putative initial examinations involved no legitimate medical decision-making whatsoever, and had pre-determined outcomes.

163.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

164.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

165.    As set forth above, in the claims identified in Exhibit "1", virtually all of the Insureds who purportedly received treatment at Silverman Chiropractic were involved in relatively minor accidents.

166.    It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

167.    It likewise is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, on or about the <u>exact same date</u> after their underlying automobile accident.

168.    It is even more improbable – to the point of impossibility – that this would occur with great frequency within a cohort of patients treating at a single clinic such as Silverman Chiropractic.

169.    Even so, in keeping with the fact that their  putative "diagnoses" were false, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, the Defendants – or the Treating Chiropractors and Treating Physicians working at the direction of the Silverman and Silverman Chiropractic – frequently issued substantially identical, phony "diagnoses", on or around the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

170.    For example:

(i)     On January 6, 2017, two Insureds – NC and MH – were involved in the same automobile accident. Thereafter – incredibly – NC and MH presented at Silverman Chiropractic for initial examinations on the exact same date, January 10, 2017. NC and MH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that NC and MH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Silverman and Silverman Chiropractic provided NC and MH with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(ii)    On June 9, 2017, two Insureds – CC and NL – were involved in the same automobile accident. Thereafter – incredibly – CC and NL presented at Silverman Chiropractic for initial examinations on the exact same date, June 20, 2017. CC and NL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CC and NL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided CC and NL with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(iii)   On July 26, 2017, two Insureds – EM and HM – were involved in the same automobile accident. Thereafter – incredibly – EM and HM presented at Silverman Chiropractic for initial examinations on the exact same date, August 2, 2017. EM and HM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EM and HM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided EM and HM with substantially identical,

false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(iv)     On November 8, 2017, two Insureds – JB and MR – were involved in the same automobile accident. Thereafter – incredibly – JB and MR presented at Silverman Chiropractic for initial examinations on the exact same date, November 11, 2017. JB and MR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JB and MR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided JB and MR with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(v)      On December 28, 2017, two Insureds – IM and NM – were involved in the same automobile accident. Thereafter – incredibly – IM and NM presented at Silverman Chiropractic for initial examinations on the exact same date, January 4, 2018. IM and NM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that IM and NM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided IM and NM with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(vi)     On February 16, 2018, two Insureds – AG and JL – were involved in the same automobile accident. Thereafter – incredibly – AG and JL presented at Silverman Chiropractic for initial examinations on the exact same date, February 19, 2018. AG and JL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AG and JL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided AG and JL with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(vii)    On March 24, 2018, two Insureds – AC and GT – were involved in the same automobile accident. Thereafter – incredibly – AC and GT presented at Silverman Chiropractic for initial examinations on the exact same date, April 18, 2018. AC and GT were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AC and GT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided AC and GT with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(viii)   On May 1, 2018, two Insureds – ER and JS – were involved in the same automobile accident. Thereafter – incredibly – ER and JS presented at Silverman Chiropractic for initial examinations on the exact same date, May 11, 2018. ER and JS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that ER and JS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided ER and JS with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(ix)    On May 26, 2018, two Insureds – SH and CR – were involved in the same automobile accident. Thereafter – incredibly – SH and CR presented at Silverman Chiropractic for initial examinations on the exact same date, May 29, 2018. SH and CR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that SH and CR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided SH and CR with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(x)     On July 19, 2018, two Insureds – CL and ML – were involved in the same automobile accident. Thereafter – incredibly – CL and ML presented at Silverman Chiropractic for initial examinations on the exact same date, July 27, 2018. CL and ML were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CL and ML suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided CL and ML with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xi)    On September 23, 2018, two Insureds – YC and EC – were involved in the same automobile accident. Thereafter – incredibly – YC and EC presented at Silverman Chiropractic for initial examinations on the exact same date, September 24, 2018. YC and EC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YC and EC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided YC and EC with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xii)   On September 28, 2018, two Insureds – CD and MD – were involved in the same automobile accident. Thereafter – incredibly – CD and MD presented at Silverman

Chiropractic for initial examinations on the exact same date, October 4, 2018. CD and MD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CD and MD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided CD and MD with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xiii)   On November 7, 2018, two Insureds – LA and WS – were involved in the same automobile accident. Thereafter – incredibly – LA and WS presented at Silverman Chiropractic for initial examinations on the exact same date, November 9, 2018. LA and WS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LA and WS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided LA and WS with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xiv)   On January 19, 2019, two Insureds – EP and SP – were involved in the same automobile accident. Thereafter – incredibly – EP and SP presented at Silverman Chiropractic for initial examinations on the exact same date, January 23, 2019. EP and SP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EP and SP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided EP and SP with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xv)    On March 8, 2019, three Insureds – AF, EP, and GP – were involved in the same automobile accident. Thereafter – incredibly – AF, EP, and GP presented at Silverman Chiropractic for initial examinations on the exact same date, March 18, 2019. AF, EP, and GP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AF, EP, and GP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided AF, EP, and GP with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xvi)   On March 8, 2019, two Insureds – AC and JC – were involved in the same automobile accident. Thereafter – incredibly – AC and JC presented at Silverman Chiropractic for initial examinations on the exact same date, March 16, 2019. AC and JC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the

vehicle. To the extent that AC and JC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided AC and JC with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xvii) On April 1, 2019, two Insureds – LR and SR – were involved in the same automobile accident. Thereafter – incredibly – LR and SR presented at Silverman Chiropractic for initial examinations on the exact same date, April 1, 2019. LR and SR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LR and SR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided LR and SR with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xviii) On April 28, 2019, two Insureds – MC and OC – were involved in the same automobile accident. Thereafter – incredibly – MC and OC presented at Silverman Chiropractic for initial examinations on the exact same date, May 4, 2019. MC and OC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MC and OC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided MC and OC with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xix) On May 8, 2019, two Insureds – RC and LP – were involved in the same automobile accident. Thereafter – incredibly – RC and LP presented at Silverman Chiropractic for initial examinations on the exact same date, May 21, 2019. RC and LP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RC and LP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided RC and LP with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xx) On May 24, 2019, two Insureds – AS and HS – were involved in the same automobile accident. Thereafter – incredibly – AS and HS presented at Silverman Chiropractic for initial examinations on the exact same date, May 25, 2019. AS and HS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AS and HS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided AS and HS with substantially identical,

false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xxi) On June 30, 2019, three Insureds – YR, LR, and CV – were involved in the same automobile accident. Thereafter – incredibly – YR, LR, and CV presented at Silverman Chiropractic for initial examinations on the exact same date, July 3, 2019. YR, LR, and CV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YR, LR, and CV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Silverman and Silverman Chiropractic provided YR, LR, and CV with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xxii) On July 8, 2019, two Insureds – LH and CH – were involved in the same automobile accident. Thereafter – incredibly – LH and CH presented at Silverman Chiropractic for initial examinations on the exact same date, July 10, 2019. LH and CH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LH and CH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided LH and CH with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xxiii) On December 5, 2019, three Insureds – MA, VC, and DE – were involved in the same automobile accident. Thereafter – incredibly – MA, VC, and DE presented at Silverman Chiropractic for initial examinations on the exact same date, December 7, 2019. MA, VC, and DE were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MA, VC, and DE suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided MA, VC, and DE with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xxiv) On January 18, 2020, two Insureds – AC and RG – were involved in the same automobile accident. Thereafter – incredibly – AC and RG presented at Silverman Chiropractic for initial examinations on the exact same date, January 25, 2020. AC and RG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AC and RG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided AC and RG with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xxv)    On February 14, 2020, two Insureds – TS and TS – were involved in the same automobile accident. Thereafter – incredibly – TS and TS presented at Silverman Chiropractic for initial examinations on the exact same date, February 28, 2020. TS and TS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that TS and TS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided TS and TS with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xxvi)   On March 11, 2020, two Insureds – BH and PH – were involved in the same automobile accident. Thereafter – incredibly – BH and PH presented at Silverman Chiropractic for initial examinations on the exact same date, March 16, 2020. BH and PH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that BH and PH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided BH and PH with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xxvii)  On January 5, 2021, two Insureds – ES and LS – were involved in the same automobile accident. Thereafter – incredibly – ES and LS presented at Silverman Chiropractic for initial examinations on the exact same date, January 25, 2021. ES and LS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that ES and LS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided ES and LS with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xxviii) On May 29, 2021, three Insureds – SA, GR, and PR – were involved in the same automobile accident. Thereafter – incredibly – SA, GR, and PR presented at Silverman Chiropractic for initial examinations on the exact same date, June 12, 2021. SA, GR, and PR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that SA, GR, and PR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided SA, GR, and PR with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xxix)   On January 14, 2022, two Insureds – VB and JN – were involved in the same automobile accident. Thereafter – incredibly – VB and JN presented at Silverman Chiropractic for initial examinations on the exact same date, January 20, 2022. VB and JN were different ages, in different physical conditions, located in different

positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that VB and JN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided VB and JN with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

(xxx)  On October 18, 2022, two Insureds – MB and SB – were involved in the same automobile accident. Thereafter – incredibly – MB and SB presented at Silverman Chiropractic for initial examinations on the exact same date, October 19, 2022. MB and SB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MB and SB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Defendants provided MB and SB with substantially identical, false soft tissue injury "diagnoses", despite the fact that they were differently situated.

171.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1" the Defendants routinely inserted false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that they purported to provide to the Insureds, including medically unnecessary follow-up examinations, physical therapy, chiropractic, nerve conduction velocity testing, and pain management services.

172.    To the extent that the Insureds in the claims identified in Exhibit "1" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back, neck, or extremities.

173.    The diagnosis and treatment of these ordinary sprains and strains did not require any "low complexity" or "moderate complexity" medical decision-making on the part of the Defendants, the Treating Chiropractors, the Treating Physicians, or any other health care providers associated with Silverman Chiropractic.

174. To the contrary, the initial examinations did not involve any legitimate medical decision-making at all, because the purported "results" of the examinations were pre-determined, falsified, and designed to provide a false justification for the laundry-list of other Fraudulent Services that the Defendants purported to provide.

175. In the claims for initial examinations identified in Exhibit "1", the Defendants routinely falsely represented that the initial examinations involved medical decision-making of low or moderate complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99203 and 99204, because CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that do not require low or moderate complexity medical decision-making.

176. In the claims for initial examinations identified in Exhibit "1", the Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

    (i) the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

    (ii) the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

    (iii) the Defendants never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they operated in pervasive violation of Florida law.

177. In this context, Silverman – who at all relevant times purported to be the sole owner of Silverman Chiropractic – did not, and could not have, legitimately supervised the business activities of Silverman Chiropractic.

178. Had Silverman actually supervised the business activities of Silverman

Chiropractic, Silverman would have noted – among other things – that Silverman Chiropractic's billing falsely represented that the purported initial examinations were legitimately and lawfully performed.

**(ii)     The Fraudulent Charges for Follow-Up Examinations at Silverman Chiropractic**

179.     In addition to their fraudulent initial examinations, the Defendants also purported to subject many of the Insureds in the claims identified in Exhibit "1" to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

180.     In the claims identified in Exhibit "1", Silverman, Mazzotta, the Treating Physicians, and the Treating Chiropractors purported to personally perform the vast majority of the follow-up examinations on behalf  in the claims identified in Exhibit "1".

181.     As set forth in Exhibit "1", the Defendants then billed the follow-up examinations to GEICO under CPT code 99213, typically resulting in charges between $158.34 and $239.60 for each follow-up examination they purported to provide.

182.     In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

183.     As set forth below, the Defendants' charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and results of the examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

184.     As set forth above, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

185.     By contrast, to the limited extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their relatively minor automobile accidents, the injuries were minor soft tissue injuries such as sprains or strains, which were not severe at all.

186.     These injuries were of low or minimal severity at the outset, and were of minimal severity by the time the Insureds presented for the purported follow-up examinations, typically weeks or even months after the underlying accidents.

187.     Even so, in the claims for follow-up examinations identified in Exhibit "1", the Defendants routinely billed for their putative follow-up examinations under CPT code 99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity at the time of the purported follow-up examinations.

188.     For example:

(i)     On June 5, 2017, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RM's vehicle did not deploy and that RM's vehicle was drivable following the accident. The police report further indicated that RM did not complain of any pain at the scene of the accident. In keeping with the fact that RM was not seriously injured in the accident, RM did not visit any hospital emergency room following the accident. To the extent that RM experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of RM by Mazzotta on August 11, 2017 – two months after the accident – the Defendants billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that RM presented with problems of low to moderate severity at the follow-up examination.

(ii)     On November 8, 2017, an Insured named LJ was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LJ's vehicle did not deploy and that LJ's vehicle was drivable following the accident. The police report further indicated that LJ did not complain of any pain at the scene of the accident. In keeping with the fact that LJ was not seriously injured in the accident, LJ did not visit any hospital emergency room following the accident. To the extent that LJ experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of LJ by Mazzotta on February 7, 2018 – three months after the accident – the

Defendants billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that LJ presented with problems of low to moderate severity at the follow-up examination.

(iii)    On November 13, 2017, an Insured named CH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CH's vehicle did not deploy. The police report further indicated that CH did not complain of any pain at the scene of the accident. In keeping with the fact that CH was not seriously injured in the accident, CH did not visit any hospital emergency room following the accident. To the extent that CH experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of CH by Quintanilla on January 31, 2018 – two months after the accident – Silverman and Silverman Chiropractic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that CH presented with problems of low to moderate severity at the follow-up examination.

(iv)    On January 12, 2019, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JO's vehicle did not deploy and that JO's vehicle was drivable following the accident. The police report further indicated that JO did not complain of any pain at the scene of the accident. In keeping with the fact that JO was not seriously injured in the accident, JO did not visit any hospital emergency room following the accident. To the extent that JO experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of JO by Mazzotta on April 24, 2019 – more than three months after the accident – the Defendants billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JO presented with problems of low to moderate severity at the follow-up examination.

(v)    On May 3, 2019, an Insured named WP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in WP's vehicle did not deploy and that WP's vehicle was drivable following the accident. The police report further indicated that WP did not complain of any pain at the scene of the accident. In keeping with the fact that WP was not seriously injured in the accident, WP did not visit any hospital emergency room following the accident. To the extent that WP experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of WP by Bressler on July 29, 2019 – nearly three months after the accident – Silverman and Silverman Chiropractic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that WP presented with problems of low to moderate severity at the follow-up examination.

(vi)     On August 8, 2019, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AC's vehicle did not deploy and that AC's vehicle was drivable following the accident. The police report further indicated that AC did not complain of any pain at the scene of the accident. In keeping with the fact that AC was not seriously injured in the accident, AC did not visit any hospital emergency room following the accident. To the extent that AC experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of AC by Quintanilla on October 31, 2019 – nearly three months after the accident – Silverman and Silverman Chiropractic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that AC presented with problems of low to moderate severity at the follow-up examination.

(vii)    On March 11, 2020, an Insured named BH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in BH's vehicle did not deploy and that BH's vehicle was drivable following the accident. The police report further indicated that BH did not complain of any pain at the scene of the accident. In keeping with the fact that BH was not seriously injured in the accident, BH did not visit any hospital emergency room following the accident. To the extent that BH experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of BH by Mazzotta on June 19, 2020 – three months after the accident – the Defendants billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that BH presented with problems of low to moderate severity at the follow-up examination.

(viii)   On February 10, 2021, an Insured named LD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LD's vehicle did not deploy and that LD's vehicle was drivable following the accident. The police report further indicated that LD did not complain of any pain at the scene of the accident. In keeping with the fact that LD was not seriously injured in the accident, LD did not visit any hospital emergency room following the accident. To the extent that LD experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of LD by Mazzotta on April 30, 2021 – two months after the accident – the Defendants billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that LD presented with problems of low to moderate severity at the follow-up examination.

(ix)     On May 27, 2021, an Insured named EC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in EC's vehicle did not deploy. The police report further indicated that EC did not complain of any pain at the scene of the accident, and in fact refused medical attention at the scene of the

accident. In keeping with the fact that EC was not seriously injured in the accident, EC visited Baptist Health Urgent Care the following day, where she was briefly observed on an outpatient basis and was diagnosed with nothing more serious than a cervical, chest wall, and shoulder strain. To the extent that EC experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of EC by Bressler on October 4, 2021 – over four months after the accident – Silverman and Silverman Chiropractic billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that EC presented with problems of low to moderate severity at the follow-up examination.

(x)     On February 3, 2023, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AA's vehicle did not deploy. The police report further indicated that AA did not complain of any pain at the scene of the accident. In keeping with the fact that AA was not seriously injured in the accident, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as a result of the accident, they were of low or minimal severity and either resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of AA by Mazzotta on April 1, 2023 – two months after the accident – the Defendants billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that EC presented with problems of low to moderate severity at the follow-up examination.

189.    These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", the Defendants routinely falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

190.    In the claims for follow-up examinations identified in Exhibit "1", the Defendants routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for their charges for the examinations under CPT code 99213, because follow-up examinations billable under CPT code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

191.     In the claims for follow-up examinations identified in Exhibit "1", the Defendants also routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.     Misrepresentations Regarding the Results of the Follow-Up Examinations**

192.     Pursuant to the CPT Assistant, when the Defendants billed for their putative follow up examinations under CPT code 99213, they represented that the physicians or chiropractors who performed the examinations – virtually always Silverman, Mazzotta, one of the Treating Physicians, or one of the Treating Chiropractors – performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

193.     In actuality, however, the physicians and chiropractors who performed the examinations did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

194.     Rather, following their purported follow-up examinations, Silverman, Mazzotta, or the Treating Physicians and Treating Chiropractors, at Silverman's direction, simply reiterated the false soft tissue injury "diagnoses" from the Insureds' initial examinations or previous follow-up examinations, recommended that the Insureds continue to return to Silverman Chiropractic for additional, medically unnecessary Fraudulent Services, or else discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

195.     In the claims for initial examinations identified in Exhibit "1", the Defendants routinely fraudulently misrepresented that the follow-up examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)      the putative follow-up examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative follow-up examinations misrepresented the nature and extent of the examinations; and

(iii)    the Defendants never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they operated in pervasive violation of Florida law.

196.     In this context, Silverman – who at all relevant times purported to be the sole owner of Silverman Chiropractic – did not, and could not have, legitimately supervised the business activities of Silverman Chiropractic.

197.     Had Silverman actually supervised the business activities of Silverman Chiropractic, Silverman would have noted – among other things – that Silverman Chiropractic's billing falsely represented that the putative follow-up examinations were legitimately and lawfully performed.

**3.     The Fraudulent Charges for Chiropractic and "Physical Therapy" Services at Silverman Chiropractic**

198.     In addition to the fraudulent initial examinations and follow-up examinations, the Defendants virtually always purported to subject each of the Insureds in the claims identified in Exhibit "1" to months of medically unnecessary chiropractic and purported physical therapy services.

199.     As set forth in Exhibit "1", the Defendants then billed the purported chiropractic and physical therapy services to GEICO under:

(i)    CPT code 97010, for putative hot/cold pack application, typically resulting in charges ranging from $15.00 to $30.00 for each round of hot/cold pack therapy they purported to provide;

(ii)   CPT code 97012, for putative mechanical traction therapy, typically resulting in charges ranging from $31.70 to $65.00 for each round of mechanical traction they purported to provide;

(iii)  CPT code 97035, for putative ultrasound, typically resulting in charges ranging from $28.82 to $61.52 for each round of ultrasound they purported to provide;

(iv)   CPT code 97110, for putative therapeutic exercises, typically resulting in charges ranging from $65.72 to $170.00 for each round of therapeutic exercises they purported to provide;

(v)    CPT code 97140, for putative manual therapy, typically resulting in a charges ranging from $58.74 to $80.00 for each round of manual therapy they purported to provide;

(vi)   CPT codes 98940, 98941, and/or 98943 for putative chiropractic manipulative treatment, typically resulting in charges of between $75.00 and $90.00 for each round of chiropractic manipulative treatment they purported to provide; and/or

(vii)  Health Care Common Procedure Coding System ("HCCPCS") code G0283 for putative electric stimulation treatments, resulting in charges ranging from $31.84 to $55.00 for each round of electrical stimulation they purported to provide.

200.    In the claims for chiropractic and purported physical therapy services identified in Exhibit "1" the charges for the chiropractic and physical therapy services were fraudulent in that they misrepresented Silverman Chiropractic's eligibility to collect PIP Benefits in the first instance.

201.    In fact, and as set forth above, Silverman Chiropractic never was eligible to collect PIP Benefits, because of its fraudulent and unlawful activities.

202.    What is more, in a legitimate clinical setting, the individual chiropractic and physical therapy services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentation.

203.   In keeping with the fact that the purported chiropractic and physical therapy services that were billed through Silverman Chiropractic to GEICO were not medically necessary, the Defendants did not tailor the chiropractic and physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

204.   There are a large number of individual types of chiropractic and physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

205.   However, the Defendants routinely purported to provide the same handful of chiropractic and physical therapy "treatments" to virtually every Insured in the claims identified in Exhibit "1", on substantially the same schedule, without regard for the Insureds' individual circumstances.

206.   Specifically, Silverman Chiropractic, Silverman, Mazzotta, and the Treating Chiropractors purported to provide virtually every Insured in the claims identified in Exhibit "1" with two-to-three months of chiropractic and physical therapy services, consisting of chiropractic adjustments, hot/cold pack application, mechanical traction, ultrasound, neuromuscular reeducation, manual therapy, therapeutic activities, and electric stimulation. This, despite the fact that the Insureds were differently situated, and could not possibly all have required a substantially identical course of chiropractic and physical therapy treatment.

207.   Furthermore, in the claims identified in Exhibit "1", the purported physical therapy services that were billed through Silverman Chiropractic to GEICO were unlawfully performed by Palmero, Aviles, and other massage therapists and unlicensed individuals, and then unlawfully billed to GEICO.

4.      **The Fraudulent Charges for HME**

208.    As part of their fraudulent scheme, the Defendants purported to prescribe many Insureds with HME.

209.    In particular, the Defendants purported to prescribe many Insureds with lumbar-sacral orthotic ("LSO") units, transcutaneous electrical nerve stimulation ("TENS") units, and cervical traction ("CT") units – that were then provided and billed through Silverman Chiropractic.

210.    As set forth in Exhibit "1", the Defendants billed GEICO for the LSOs: (i) under HCPCS code L0627, typically resulting in charges ranging between $750.00 and $950.00; or (ii) under HCPCS code L0642, typically resulting in charges ranging between $414.05 and $716.76.

211.    As set forth in Exhibit "1", the Defendants billed GEICO for the TENS units under HCPCS code E0730, typically resulting in charges between $495.00 and $800.00 for each putative TENS unit.

212.    As set forth in Exhibit "1", the Defendants billed GEICO for the CT units using HCPCS code E0855, typically resulting in a charge of $950.00 for each putative CT unit.

213.    In the claims for HME identified in Exhibit "1", the charges for the HME were fraudulent and unlawful in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

214.    In fact, the Defendants never were eligible to collect PIP Benefits, inasmuch as they operated in violation of the Florida law.

215.    As set forth below, the Defendants' charges for the HME identified in Exhibit "1" also were fraudulent in that they misrepresented the medical necessity of the putative HME.

**a.      The Fraudulent Charges for the Medically Unnecessary LSOs**

216.    An LSO is a custom-fitted, lower-back brace designed to restrict the movement of the patient's torso and support the patient's lumbar spine. Because of its rigidity and required placement on a patient's lower back, an LSO must be custom-fitted in order for it to be properly utilized by the patient.

217.    Because the LSO is designed to limit a patient's lumbar spine range of motion, its prescription is inconsistent with the goals of treatment designed to restore and increase range of motion and functionality of the lumbar spine.

218.    Along similar lines, the prescription and use of an LSO is counterproductive to the goals of physical therapy and chiropractic treatment modalities, which seek to restore movement and functionality to the lumbar spine.

219.    In fact, the medically unnecessary prescription of an LSO – and resulting immobilization of the lumbar spine – may put the patient at considerable risk of weakening muscles or even muscle atrophy of muscles in the lower back.

220.    Moreover, in a legitimate clinical setting, an LSO should not be prescribed to a patient before that patient failed a legitimate course of conservative treatment.

221.    The Insureds in the claims identified in Exhibit "1" did not suffer from spinal instability. In fact, virtually none of the Insureds in the claims identified in Exhibit "1" suffered any serious injuries at all as the result of their minor accidents, much less health problems requiring spinal surgery and subsequent immobilization of their spine.

222.    The Insureds in the claims identified in Exhibit "1" generally had not attempted and failed a legitimate course of conservative treatment prior to their receipt of a prescription for an LSO.

223.     Even so, the Defendants routinely purported to provide medically unnecessary LSOs to the Insureds in the claims identified in Exhibit "1", despite that fact that:

(i)      the Insureds did not suffer from spinal instability and were not recovering from spinal surgery;

(ii)     the Defendants did not measure or fit the devices for the Insureds;

(iii)    the Insureds had not yet failed any legitimate course of conservative treatment and, in fact, were prescribed the LSO within days – and, in some instances, the very same day – of their minor accidents; and

(iv)     the Insureds were often concomitantly referred for physical therapy and chiropractic treatment at Silverman Chiropractic, the supposed purpose of which was to restore the range of motion and functionality of, among other things, the Insureds' lumbar spine.

**b.      The Fraudulent Charges for the Medically Unnecessary TENS Units**

224.     In a legitimate clinical setting, electrostimulation treatment of the kind provided by TENS units may be prescribed and used to treat pain. The device transmits electrical signals to the brain that compete with pain signals from the brain, resulting in a reduction in the patient's perception of pain.

225.     However, there is a dearth of quality scientific evidence supporting the use of the kind of therapeutic electrical stimulation provided by a TENS unit when administered contemporaneously with a regular course of conservative treatment such as chiropractic and/or physical therapy.

226.     Even so, in the claims identified in Exhibit "1", the Defendants routinely provided medically unwarranted TENS units to Insureds despite the fact that the Insureds suffered only minor soft-tissue injuries, to the limited extent they suffered any injuries at all, that did not require the use of a TENS unit in the first instance; and

5.      **The Fraudulent Charges for Electrodiagnostic Testing**

227.      As set forth in Exhibit "1" based upon the fraudulent, predetermined "diagnoses" provided during the initial and follow-up examinations, the Defendants purported to subject many Insureds to a series of medically unnecessary, useless, and illusory electrodiagnostic ("EDX") tests, including nerve conduction velocity ("NCV") tests.

228.      Typically, Mazzotta purported to perform the NCV tests, which then were billed to GEICO through Silverman Chiropractic.

229.      As set forth in Exhibit "1", Silverman Chiropractic, Silverman, and Mazzotta then billed the NCV tests to GEICO primarily under CPT codes 95911 and 95913, typically resulting in charges ranging from $508.52 and $848.00 for each putative NCV test.

230.      The charges for the NCV tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the fraudulent boilerplate "findings" and "diagnoses" that the Defendants purported to provide during their phony initial and follow-up examinations, and not to treat or otherwise benefit the Insureds.

231.      Moreover, in the claims for NCV tests identified in Exhibit "1", the charges for the NCV tests were fraudulent in that they misrepresented Silverman Chiropractic's eligibility to collect PIP Benefits in the first instance.

a.      **The Human Nervous System and Electrodiagnostic Testing**

232.      The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

233.      Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit

76

signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

234.     The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

235.     Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

236.     The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

237.     NCVs are a form of EDX test, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

238.     The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

239.     The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

240.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

241.    However, according to the Recommended Policy, both NCV tests and electromyography ("EMG") tests normally must be performed together in order to provide a clinical diagnosis of peripheral nervous system disorders, including radiculopathies. As the Recommended Policy states:

> Radiculopathies cannot be diagnosed by NCS [i.e., NCV tests] alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these studies should be performed together by one physician supervising and/or performing all aspects of the study.
> …
>
> The EDX laboratory must have the ability to perform needle EMGs. NCSs should not be performed without needle EMG except in unique circumstances."

**b.      The Fraudulent NCV Tests**

242.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

243.    In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

244.     In order to be clinically useful in the diagnoses of peripheral nervous system disorders, NCVs and EMGs must be performed together.

245.     There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

246.     F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

247.     In the claims for NCV tests identified in Exhibit "1", the Defendants routinely billed for the NCV tests despite the fact that no corresponding EMGs had been performed, making the tests useless in the diagnosis and treatment of the Insureds.

248.     Moreover, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Mazzotta and Silverman Chiropractic – at the direction of Silverman – routinely purported to test far more nerves than recommended by the Recommended Policy.

249.     Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants routinely purported to perform and/or provide: (i) NCV tests of 4 motor nerves; (ii) NCV tests of 6 sensory nerves; (iii) multiple F-wave studies; and (iv) multiple H-reflex studies, despite not performing an EMG test contemporaneously to properly "diagnose" a radiculopathy.

250.     For example:

(i)     On January 22, 2018, Silverman, Mazzotta, and Silverman Chiropractic purported to provide 4 motor nerve NCV tests and 6 sensory nerve tests to an Insured named LJ, supposedly to determine whether LJ suffered from a radiculopathy. What is more, Silverman, Mazzotta, and Silverman Chiropractic did not contemporaneously provide LJ with an EMG, rendering the NCV tests medically useless.

(ii)    On June 15, 2020, Silverman, Mazzotta, and Silverman Chiropractic purported to provide 4 motor nerve NCV tests and 6 sensory nerve tests to an Insured named ML, supposedly to determine whether ML suffered from a radiculopathy. What is more, Silverman, Mazzotta, and Silverman Chiropractic did not contemporaneously provide ML with an EMG, rendering the NCV tests medically useless.

(iii)   On June 22, 2020, Silverman, Mazzotta, and Silverman Chiropractic purported to provide 4 motor nerve NCV tests and 4 sensory nerve tests to an Insured named YA, supposedly to determine whether YA suffered from a radiculopathy. What is more, Silverman, Mazzotta, and Silverman Chiropractic did not contemporaneously provide YA with an EMG, rendering the NCV tests medically useless.

(iv)    On February 24, 2021, Silverman, Mazzotta, and Silverman Chiropractic purported to provide 4 motor nerve NCV tests and 6 sensory nerve tests to an Insured named LD, supposedly to determine whether LD suffered from a radiculopathy. What is more, Silverman, Mazzotta, and Silverman Chiropractic did not contemporaneously provide LD with an EMG, rendering the NCV tests medically useless.

(v)     On January 18, 2022, Silverman, Mazzotta, and Silverman Chiropractic purported to provide 4 motor nerve NCV tests and 6 sensory nerve tests to an Insured named CP, supposedly to determine whether CP suffered from a radiculopathy. What is more, Silverman, Mazzotta, and Silverman Chiropractic did not contemporaneously provide CP with an EMG, rendering the NCV tests medically useless.

(vi)    On June 2, 2022, Silverman, Mazzotta, and Silverman Chiropractic purported to provide 4 motor nerve NCV tests and 6 sensory nerve tests to an Insured named EH, supposedly to determine whether EH suffered from a radiculopathy. What is more, Silverman, Mazzotta, and Silverman Chiropractic did not contemporaneously provide EH with an EMG, rendering the NCV tests medically useless.

(vii)   On December 14, 2022, Silverman, Mazzotta, and Silverman Chiropractic purported to provide 4 motor nerve NCV tests and 6 sensory nerve tests to an Insured named MB, supposedly to determine whether MB suffered from a radiculopathy. What is more, Silverman, Mazzotta, and Silverman Chiropractic did

not contemporaneously provide MB with an EMG, rendering the NCV tests medically useless.

(viii)   On January 16, 2023, Silverman, Mazzotta, and Silverman Chiropractic purported to provide 4 motor nerve NCV tests and 6 sensory nerve tests to an Insured named SR, supposedly to determine whether SR suffered from a radiculopathy. What is more, Silverman, Mazzotta, and Silverman Chiropractic did not contemporaneously provide SR with an EMG, rendering the NCV tests medically useless.

(ix)   On January 18, 2023, Silverman, Mazzotta, and Silverman Chiropractic purported to provide 4 motor nerve NCV tests and 6 sensory nerve tests to an Insured named JC, supposedly to determine whether JC suffered from a radiculopathy. What is more, Silverman, Mazzotta, and Silverman Chiropractic did not contemporaneously provide JC with an EMG, rendering the NCV tests medically useless.

(x)   On February 20, 2023, Silverman, Mazzotta, and Silverman Chiropractic purported to provide 4 motor nerve NCV tests and 6 sensory nerve tests to an Insured named EL, supposedly to determine whether EL suffered from a radiculopathy. What is more, Silverman, Mazzotta, and Silverman Chiropractic did not contemporaneously provide EL with an EMG, rendering the NCV tests medically useless.

251.   The Defendants were concerned that the large, medically unnecessary number of NCV tests they were purporting to provide would draw attention to their fraudulent scheme.

252.   Accordingly, Silverman, Mazzotta, and Silverman Chiropractic acted to conceal the number of NCV tests they provided to any individual Insured, by purporting to provide the tests on multiple days and splitting the billing for the NCV tests into two separate bills for each individual Insured.

253.   Other than to conceal the massive number of NCV tests they purported to provide to each individual Insured, there was no reason why the Silverman, Mazzotta, and Silverman Chiropractic would perform the NCV tests on multiple days and split the billing for the NCV tests into two separate bills for each individual Insured.

254.   Furthermore, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

255.   In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

256.   This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

257.   This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

258.   However, Silverman, Mazzotta, and Silverman Chiropractic did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

259.   Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in virtually all of the NCV claims identified in Exhibit "1".

260.   In particular, the Defendants purported to test some combination of the following peripheral nerves and nerve fibers – and, in most cases, all of them – in virtually all of the NCV test claims identified in Exhibit "1":

(i)      left and right median motor nerves;

      (ii)      left and right ulnar motor nerves;

      (iii)     left and right peroneal motor nerves;

      (iv)     left and right tibial motor nerves;

      (v)      left and right median sensory nerves;

      (vi)     left and right radial sensory nerves; and

      (vii)    left and right ulnar sensory nerves.

261.    The cookie-cutter approach to the NCV tests that Silverman, Mazzotta, and Silverman Chiropractic purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that the Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

**6.**      **The Fraudulent Charges for Pain Management Injections at Silverman Chiropractic**

262.    As set forth in Exhibit "1", based upon the false, boilerplate "diagnoses" that Silverman, Silverman Chiropractic, and Mazzotta provided during their fraudulent initial and follow-up examinations, Silverman and Silverman Chiropractic purported to subject many Insureds to a series of medically unnecessary pain management injections.

263.    Ibraheim purported to perform virtually all of the pain management injections at Silverman Chiropractic, which then were billed to GEICO through Silverman Chiropractic, typically under CPT codes 20551, 20553, 20610, 62321, 62323, 64483, 64490, 64491, 64493, 64494, and 64495.

264.    Like the charges for the other Fraudulent Services, the charges for the pain management injections were fraudulent in that the pain management injections were medically

unnecessary and were provided – to the extent that they were provided at all – pursuant to the false, boilerplate "diagnoses" that the Defendants provided during their fraudulent examinations.

265.     Moreover, in the claims for pain management injections identified in Exhibit "1", the charges for the pain management injections were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance. In fact, because of the fraudulent and unlawful activities described herein, the Defendants were not entitled to collect PIP Benefits.

266.     Moreover, to the extent that the Insureds in the claims identified in Exhibit "1" experienced any injuries at all in their minor accidents, the injuries virtually always were minor soft tissue injuries such as sprains and strains.

267.     By the time Silverman and Silverman Chiropractic purported to provide pain management injections to the Insureds identified in Exhibit "1", the Insureds either had no presenting problems at all, or their presenting problems consisted of minor sprains and strains that were in the process of being resolved through conservative treatment.

268.     Even so, in the claims for pain management injections identified in Exhibit "1" Silverman and Silverman Chiropractic routinely purported to provide pain management injections to Insureds who did not have any serious pain symptoms secondary to any automobile accident that legitimately would warrant the injections.

269.     In their claims for pain management injections identified in Exhibit "1", Silverman and Silverman Chiropractic routinely misrepresented that the billed-for injections were medically necessary and lawfully provided, when in fact they were not.

### III.     The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO

270.     To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through Silverman

Chiropractic to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

271.    The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with Florida law, and therefore were eligible to collect PIP Benefits in the first instance. In fact, the Defendants never were in compliance with Florida law, and never were eligible to collect PIP Benefits, because of the fraudulent and unlawful scheme described above.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (b) they were provided – to the extent that they were provided at all – in pervasive violation of the No-Fault Law, the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act; and (c) in many cases, they were unlawfully performed – to the extent that they were performed at all – by massage therapists and other unlicensed individuals.

(iii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the nature, extent, and results of the Fraudulent Services that purportedly were provided.

IV.     **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

272.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

273.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

274.    The Defendants knowingly misrepresented and concealed facts related to Silverman Chiropractic and the Fraudulent Services in an effort to prevent discovery that Silverman Chiropractic was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act.

275.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

276.    Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

277.    For instance, the Defendants submitted facially valid HCFA-1500 forms, which purported to be signed and verified by properly licensed health care providers, in support of their fraudulent charges, and GEICO had a right to rely on this facially-valid billing.

278.     The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

279.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $9,000,000.00.

280.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Silverman Chiropractic
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

281.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 280 above.

282.     There is an actual case in controversy between GEICO and Silverman Chiropractic regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

283.     Silverman Chiropractic has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act.

284.     Silverman Chiropractic has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided and billed to GEICO.

285.     Silverman Chiropractic has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

286.     Silverman Chiropractic has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

287.     Silverman Chiropractic has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO, and routinely misrepresented the identities of the individuals who performed or directly supervised the services.

288.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Silverman Chiropractic has no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Silverman**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

289.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 280 above.

290.    Silverman Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

291.    Silverman knowingly has conducted and/or participated, directly or indirectly, in the conduct of the Silverman Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Silverman Chiropractic was not eligible to receive under the No-Fault Law because: (i) Silverman Chiropractic unlawfully was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO, as well as the identities of the individuals who performed or directly supervised the services..

292.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1".

293.    Silverman Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of

mail fraud are the regular way in which Silverman operated Silverman Chiropractic, inasmuch as Silverman Chiropractic was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential in order for Silverman Chiropractic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Silverman Chiropractic to the present day.

294.    Silverman Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Silverman Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

295.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $8,000,000.00 pursuant to the fraudulent bills submitted through Silverman Chiropractic.

296.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Silverman and Mazzotta**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

297.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 280 above.

298.    Silverman Chiropractic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

299.     Silverman and Mazzotta knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Silverman Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Silverman Chiropractic was not entitled to receive under the No-Fault Laws because: (i) Silverman Chiropractic unlawfully was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO, as well as the identities of the individuals who performed or directly supervised the services.

300.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

301.     Silverman Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of

mail fraud are the regular way in which Silverman has operated Silverman Chiropractic, inasmuch as Silverman Chiropractic is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Silverman Chiropractic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Silverman Chiropractic to the present day.

302.    Silverman Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Silverman Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

303.    Silverman, Mazzotta, and Silverman Chiropractic knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

304.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $8,000,000.00 pursuant to the fraudulent bills submitted through Silverman Chiropractic.

305.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Silverman, Mazzotta, and Silverman Chiropractic
### (Common Law Fraud)

306.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 280 above.

307.   Silverman, Mazzotta, and Silverman Chiropractic intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Silverman Chiropractic for the Fraudulent Services.

308.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that the Defendants were in compliance with the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act, and eligible to collect PIP Benefits in the first instance, when in fact the Defendants never were in compliance with the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed; and (v) in many claims, the representation that the Fraudulent Services had been performed or directly supervised by physicians and chiropractors, when in fact the Fraudulent Services were performed without supervision by massage therapists and unlicensed individuals.

309.     The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Silverman Chiropractic that were not reimbursable.

310.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $8,000,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted through Silverman Chiropractic.

311.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

312.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Silverman and Silverman Chiropractic
### (Under Fla. Stat. § 501.201 et. seq.)

313.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 280 above.

314.     Silverman and Silverman Chiropractic are actively engaged in trade and commerce in the State of Florida.

315.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

316.     Silverman and Silverman Chiropractic engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

317.    The claims and supporting documents submitted to GEICO in connection with the Fraudulent Services were unfair, deceptive, and unconscionable in that they misrepresented: (i) that the Defendants were in compliance with the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act, and eligible to collect PIP Benefits in the first instance, when in fact the Defendants never were in compliance with the Clinic Act, the False and Fraudulent Insurance Claims Statute, and the Physical Therapy Act; (ii) that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; (iv) that the Fraudulent Services actually were performed, when in many cases they were not actually performed; and (v) that the Fraudulent Services had been performed or directly supervised by physicians and chiropractors, when in fact the Fraudulent Services were performed without supervision by massage therapists and unlicensed individuals.

318.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of Silverman and Silverman Chiropractic has been materially injurious to GEICO and its Insureds.

319.    The conduct of Silverman and Silverman Chiropractic was the actual and proximate cause of the damages sustained by GEICO.

320.    Silverman and Silverman Chiropractic's unfair and deceptive acts have caused GEICO to sustain damages of at least $8,000,000.00.

321.    By reason of Silverman and Silverman Chiropractic's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION
### Against Silverman, Mazzotta, and Silverman Chiropractic
### (Unjust Enrichment)

322.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 280 above.

323.     As set forth above, Silverman, Mazzotta and Silverman Chiropractic have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

324.     When GEICO paid the bills and charges submitted or caused to be submitted by Silverman and Mazzotta through Silverman Chiropractic, it reasonably believed that it was legally obligated to make such payments based on the Silverman, Mazzotta and Silverman Chiropractic's improper, unlawful, and/or unjust acts.

325.     Silverman, Mazzotta and Silverman Chiropractic have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Silverman, Mazzotta and Silverman Chiropractic voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

326.     Silverman, Mazzotta and Silverman Chiropractic's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

327.     By reason of the above, Silverman, Mazzotta and Silverman Chiropractic have been unjustly enriched in an amount to be determined at trial, but in no event less than $8,000,000.00.

## JURY DEMAND

328.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against Silverman Chiropractic, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Silverman Chiropractic has no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Silverman, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $8,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Silverman and Mazzotta, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $8,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Silverman, Mazzotta and Silverman Chiropractic, compensatory damages in an amount to be determined at trial but in excess of $8,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Silverman and Silverman Chiropractic, compensatory damages in an amount to be determined at trial but in excess of $8,000,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2); and

F.      On the Sixth Cause of Action against Silverman, Mazzotta and Silverman Chiropractic, compensatory damages in an amount to be determined at trial but in excess of $8,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated:          September 11, 2023

*/s/ Kristen Wenger*
Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen Wenger (FBN 92136)
RIVKIN RADLER, LLP
Riverplace Tower
1301 Riverplace Blvd., Suite 1000
Jacksonville, FL 32207
Phone: (904) 791-8948
Facsimile: (904) 598-6225
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Lindsey.Trowell@rivkin.com
Kristen.Wenger@rivkin.com

*Counsel for Plaintiffs*
